UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
LEE MATHIS,

                    Plaintiff,

        -against-                              <u>MEMORANDUM & ORDER</u>
                                               08-CV-1163(JS)(ETB)
LIBERTY MOVING CO. and UNITED VAN
LINES,

                    Defendants.
----------------------------------------X
APPEARANCES:

For Plaintiff:       Domingo R. Gallardo, Esq.
                     Catalano Gallardo & Petropoulos LLP
                     100 Jericho Quadrangle, Suite 214
                     Jericho, NY 11753

For Defendants:      George W. Wright, Esq.
                     George W. Wright & Associates, LLC
                     505 Main Street, Suite 106
                     Hackensack, NJ 07601

SEYBERT, District Judge:

        On May 18, 2011, the Court held a hearing to determine

whether Plaintiff Lee Mathis breached the confidentiality

provision of the Settlement Agreement (the "Agreement") that he

reached with Defendant Liberty Moving Company ("Liberty") to end

his employment discrimination case.  At the end of the hearing,

the Court rejected Liberty's claim that Plaintiff breached the

Agreement multiple times, and it reserved judgment as to

Liberty's claim that he breached the Agreement once.  Mid-way

through the hearing, Plaintiff asserted a claim that Liberty

also breached the Agreement; the Court reserved judgment on this

issue as well.  Having considered the evidence and the parties'
post-hearing letters, the Court concludes that neither Plaintiff
nor Liberty proved their claims.

BACKGROUND

Plaintiff, a 72-year-old black male, worked at
Liberty, a moving company, from approximately late 2001 until
2006.  (Tr. 142, 162-63.)  The parties disagree as to the
precise nature of Plaintiff's employment status--e.g., whether
he was a day laborer or a Liberty employee--but essentially
Plaintiff was paid to help load and unload Liberty's moving
vans.  (Tr. 141-42.)  Plaintiff was known among his colleagues
as "Big Lee."  (Tr. 58.)  In 2008, Plaintiff sued Liberty for
race and age discrimination after Liberty allegedly assigned
Plaintiff fewer shifts in favor of younger, non-black laborers.
(See Third Am. Compl. ¶¶ 15-26.)  In the course of pursuing his
case, Plaintiff and his counsel spoke with many Liberty
employees about joining the suit or testifying on Plaintiff's
behalf.  (Tr. 144.)  In December 2010, the parties settled
Plaintiff's lawsuit and entered into the Agreement.

To settle the case, Liberty agreed to pay Plaintiff
$68,646.46 in exchange for a general release.  The Agreement was
executed on December 10, 2010, and it provided for the
settlement amount to be paid in four installments: (1) $2,500
paid to Plaintiff by December 20, 2010; (2) $27,500 paid to

Plaintiff thirty days after the Agreement was executed; (3) $8,646.46 paid to Plaintiff's appointed counsel to cover the costs of Plaintiff's lawsuit; and (4) a final $30,000 paid to Plaintiff 120 days after the Agreement was executed.  (Agreement ¶¶ 4-4.4.)

The Agreement also contained a confidentiality provision, which provided in relevant part that:

> Commencing on November 18, 2010, Plaintiff, Plaintiff's counsel, LIBERTY representatives Mr. Michael Federico, Sr., Ms. Cindy Federico, Mr. Michael Federico, Jr. and Mr. Anthony Federico and UNITED representatives Mr. Michael DiRaimondo, Mr. Joseph Schmelzle and Mr. Keith McFarland shall maintain the existence and terms of this Agreement in strict confidence, and shall make no disclosure thereof to any other party except as provided herein below.  Notwithstanding the foregoing, Plaintiff, LIBERTY or UNITED may disclose the existence and terms of this Agreement only as follows:
>
> 6.1 to the extent necessary to enforce or comply with the terms of this Agreement, but only after seven (7) days prior written notice given by the disclosing Party to the other Party.

(Agreement ¶¶ 6-6.1.)

Cindy Federico, a co-owner of Liberty and a participant in the settlement negotiations (Tr. 8), testified that, from Liberty's standpoint, the confidentiality clause was a critical component of the settlement because Liberty was concerned about having to defend copycat lawsuits brought by

other minority laborers.  (Tr. 8, 13, 43.)  The parties agreed that any confidentiality breach would result in liquidated damages of $10,000:

> A Party's failure to comply with any part of [the Confidentiality provision] shall be considered a material and substantial breach of this Confidential Settlement Agreement and General Release.  Plaintiff and LIBERTY mutually agree that either Party shall be entitled to recover as liquidated damages from the other Party the sum of $10,000.00 for any breach of [the Confidentiality provision].  The Parties further agree this liquidated damages provision is an integral part of the consideration for this Agreement and is included in this Agreement to relieve them from the burden of proving actual damages resulting from any breach of [the Confidentiality provision].

(Agreement ¶ 8.)

Federico told Liberty's comptroller, John Kenyon, about the Agreement so that he could prepare the Plaintiff's payments.  (Tr. 11-12.)  Liberty did not notify Plaintiff that it planned to inform Kenyon about the Agreement.  (Tr. 28-29.) With Kenyon's help, Liberty made the first three payments substantially on schedule.

Liberty was due to make its fourth and final payment to Plaintiff 120 days after the Agreement was executed, or approximately the second week of April 2011.  Before Liberty cut its last check, however, one of its employees received a voicemail that caused Liberty to suspect that Plaintiff had

breached the confidentiality agreement. On April 5 or 6, Liberty's over-the-road dispatcher, Robert Franklin, received a voicemail in which the caller stated, among other things, that "Big Lee getting' his money this week" and that it was "Somebody else turn to get rich." (See Tr. 72-73 (indicating that the voicemail was played for the Court).) Franklin recognized the caller, who did not identify himself, as Desmond Estrick (Tr. 72), one of Liberty's former laborers and a friend of Plaintiff's (see Tr. 61). Franklin testified that he had heard Estrick's voice many times before. (Tr. 64-65.) Franklin brought the voicemail to his supervisors' attention, and Liberty decided to withhold Plaintiff's final check and investigate the possible confidentiality breach. (Tr. 37-38.)

As part of its investigation, Liberty had Franklin call Estrick to find out whether Plaintiff had told Estrick about the settlement and the impending $30,000 payment. (See Tr. 128.) Franklin called Estrick twice during the evening of April 8, 2011, and he recorded both phone calls with a digital voice recorder. The first call, the recording of which was not played for the Court, lasted more than twenty minutes and consisted largely of Franklin's attempting to get Estrick to admit that he had left the voicemail. (Tr. 122.) Estrick repeatedly denied that he had left Franklin any message about Plaintiff. (Tr. 114-15.) A few hours later, Franklin called

Estrick back and, using a second telephone, played for Estrick the voicemail (which had been saved to Liberty's voicemail system). Confronted with the recording, Estrick laughed and remembered leaving the message. (April 8, 2011 8:00 p.m. Call; see also Tr. 80 (indicating that tape was played for the Court).) On that call, Estrick explained that he had heard through the grapevine that "Big Lee" was getting a "package" soon from Liberty, and he denied that Plaintiff told Estrick this information. (April 8, 2011 8:00 p.m. Call.)

For his part, Plaintiff denied that he told anyone about the Agreement and said that he went so far as to tell his wife that the settlement money was the result of a lottery win. (Tr. 149.) He said that he speaks with Estrick "probably every week." (Tr. 146.) At the time of the hearing, their most recent conversation had occurred the weekend before, during which Estrick asked Plaintiff to borrow money. (Tr. 146.) Estrick, like many of Plaintiff's former colleagues who knew of his lawsuit, occasionally asks Plaintiff about the status of the case. (Tr. 146.) According to Plaintiff, he tells Estrick and anyone else who asks that the action is still in the courts and that he is waiting to hear from his lawyer. (Tr. 146.) There was evidence during Plaintiff's testimony that he has several felony and misdemeanor convictions on his record and that he

6

omitted or lied about parts of his criminal record during his
depositions in this case.  (Tr. 157-161.)

## DISCUSION

The Court concludes that neither Liberty nor Plaintiff
can sustain their breach of contract claims.  Claims for breach
of confidentiality provisions are treated as any other breach of
contract claim.  See, e.g., First Games Publisher Network, Inc.
v. Afonin, 32 Misc.3d 1245(A), 2011 N.Y. Slip Op. 51706(U), 2011
WL 4357673, at *3 (N.Y. Sup. Ct. Aug. 12, 2011) (unpublished)
(treating breach of confidentiality provision using breach of
contract analysis).  To prevail, the party asserting a breach
must prove by a preponderance of the evidence (1) the existence
of a contract; (2) the moving party's performance under the
contract; (3) the defending party's breach; and (4) resulting
damages.  Palmetto Partners, L.P. v. AJW Qualified Partners,
LLC, 83 A.D.3d 804, 806, 921 N.Y.S.2d 260, 264, 921 N.Y.S.2d 260
(2d Dep't 2011); McCormick v. Favreau, 82 A.D.3d 1537, 1541, 919
N.Y.S.2d 572, 577, 919 N.Y.S.2d 572 (3d Dep't 2011); JP Morgan
Chase v. J.H. Elec. of New York, Inc., 69 A.D.3d 802, 803, 893
N.Y.S.2d 237, 239, 893 N.Y.S.2d 237 (2d Dep't 2010).  That the
parties had a valid contract is undisputed.

Neither party can prevail on their breach claim
because neither party can prove that it performed its
obligations under the confidentiality provision.  Liberty

conceded that it disclosed the Agreement to John Kenyon without providing Plaintiff with the required notice. Liberty argues that Kenyon was authorized to know of the Agreement because his knowledge was necessary to effect payment to Plaintiff. (Liberty Ltr. 2.) This interpretation is at odds with the plain language of the Agreement, which provided an exception to the confidentiality requirement "to the extent necessary to enforce or comply with" the Agreement but "but only after seven (7) days prior written notice." (Agreement ¶ 6.1.) Liberty's interpretation would effectively cut this exception out of the contract, and courts are loathe to read contracts in a way that renders a clause meaningless. See, e.g., Manley v. AmBase Corp., 337 F.3d 237, 250 (2d Cir. 2003) (New York law "disfavors interpretations that render contract provisions meaningless or superfluous").

Similarly, Plaintiff cannot establish Liberty's breach because Plaintiff himself did not honor the confidentiality clause. Liberty established that Estrick knew of the settlement and that Estrick's knowledge more likely than not stemmed from Plaintiff's divulging the Agreement. The Court reaches the latter conclusion for two main reasons. First, Liberty believed that it had a strong incentive to keep quiet about the settlement. It negotiated the confidentiality provision because it was concerned that news of the Agreement would trigger

8

further lawsuits from its other laborers; Liberty's officers, then, had little reason to disseminate details of the settlement. Second, Plaintiff was friends with Estrick and communicated with him weekly. Estrick was familiar with Plaintiff's lawsuit and, unsurprisingly, would ask about its progress. Unlike Liberty, Plaintiff was not concerned about further lawsuits brought by other laborers, and thus had less of an incentive to hide the nature of his Agreement from his friend. At bottom, this is a he-said/she-said case: Estrick learned of the settlement from someone, and the Court thinks that, more likely than not, that someone was Plaintiff.

In reaching this conclusion, the Court notes two evidentiary issues. First, the Court overrules Plaintiff's hearsay objections to the extent they relate to Estrick's statements concerning the settlement. The hearsay rule generally prohibits out-of-court statements offered to prove the truth of the matter asserted. E.g., United States v. Gomez, 91, 617 F.3d 88, 91 (2d Cir. 2010). Here, however, Estrick's statements were not offered to show the truth of their contents--e.g., that Plaintiff was, in fact, getting his money that week--but rather to prove that Estrick knew that Plaintiff's case had settled. Second, the Court has not considered evidence of Plaintiff's criminal record, which includes misdemeanors more than ten years old and felonies of an uncertain date. See

generally Fed. R. Evid. 609.  Nor has it considered Plaintiff's inconsistent discussion of his criminal record at his depositions.  Although his shifting testimony may bear on his credibility, Liberty may not prove that shifting testimony through extrinsic evidence.  Fed. R. Evid. 608(b); <u>see</u> <u>also</u> <u>Fox</u> <u>v. City Univ. of N.Y.</u>, No. 94-CV-4398, 1998 WL 283284, at *1 (S.D.N.Y. June 2, 1998).

<u>CONCLUSION</u>

For the foregoing reasons, the Court concludes that neither Liberty nor Plaintiff has proved a breach of contract. The net balance due and owing Plaintiff is $10,000 plus whatever interest has accrued while these funds were on deposit with the Court's registry.  The Clerk of the Court is directed to take the steps necessary to release the $10,000 and its accrued interest to Plaintiff's counsel.

SO ORDERED.

/s/ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated:    October __26__, 2011
          Central Islip, New York